E-FILED
Friday, 28 October, 2022 04:40:56 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | |
|---|---|
| IN RE AFNI, INC. DATA BREACH LITIGATION | Case No. 1:22-cv-01287-JES-JEH |
| This Document Relates To: | **CLASS ACTION** |
| *All Cases* | JURY TRIAL DEMANDED |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Marian Caldwell Powell, Leniox Campbell, Leslie Green, and Thomas Davis ("Plaintiffs"), individually, and on behalf of all others similarly situated (collectively, "Class members"), by and through their attorneys, bring this Class Action Complaint against Defendant Afni, Inc. ("Afni" or "Defendant") and complain and allege upon personal knowledge as to themselves and information and belief as to all other matters.

## INTRODUCTION

1.      Plaintiffs bring this class action against Afni for its failure to secure and safeguard their and approximately 261,449 other individuals' personally identifiable information ("PII"), including names, addresses, dates of birth, and Social Security numbers.

2.      Afni is a company that provides customer engagement services to its clients. This includes debt collection services and customer growth services.

3.      On or about June 7, 2021, unauthorized individuals gained access to Afni's network systems and accessed the PII of Plaintiffs and Class members (the "Data Breach").

4.      Afni owed a duty to Plaintiffs and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against

unauthorized access and disclosure. Afni breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect Plaintiffs' and Class members' PII from unauthorized access and disclosure.

5.      The Data Breach resulted from Afni's inadequate security and its breach of its duties and obligations to protect the PII it collected and stored. As a result, Plaintiffs' and Class members' PII was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiffs bring this action on behalf of themselves and all persons whose PII was exposed as a result of the Data Breach, which Afni discovered on or about June 7, 2021.

6.      Plaintiffs, on behalf of themselves and all other Class members, assert claims for negligence, breach of implied contract, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, unjust enrichment, and invasion of privacy and seek declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

7.      Plaintiff Marian Caldwell Powell is a resident and citizen of Illinois, where she intends to remain. She received a letter from Afni notifying her that her PII was accessed in the Data Breach. Plaintiff Caldwell Powell would not have allowed Afni to have access to her PII if she had known Afni would not adequately protect her PII.

8.      Plaintiff Leniox Campbell is a resident and citizen of Illinois, where he intends to remain. Plaintiff Campbell was employed by Afni from 1997 to 2020. He received a letter from Afni notifying him that his PII was accessed in the Data Breach. Plaintiff Campbell would not have allowed Afni to have access to his PII if he had known Afni would not adequately protect his PII.

9.      Plaintiff Leslie Green is a resident and citizen of Michigan, where she intends to remain. Plaintiff Green received a letter from Afni notifying her that her PII was accessed in the Data Breach. Plaintiff Green would not have allowed Afni to have access to her PII if she had known Afni would not adequately protect her PII.

10.     Plaintiff Thomas Davis is a resident and citizen of Kentucky, where he intends to remain. Plaintiff Davis was employed by Afni from 2019 to 2020. He received a letter from Afni notifying him that his PII was accessed in the Data Breach. Plaintiff Davis would not have allowed Afni to have access to his PII if he had known Afni would not adequately protect his PII.

11.     Defendant Afni, Inc. is an Illinois Corporation. Afni's principal place of business is located at 1310 Martin Luther King Jr. Dr., Bloomington, Illinois 61701.

## JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

13.     This Court has personal jurisdiction over Afni because Afni has its principal place of business in Illinois.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Afni's principal place of business is located in McLean County, Illinois.

15.     The Peoria Division is the proper location for the filing of this action as a substantial portion of the events leading to the causes of action in this complaint arose in McLean County, Illinois, and Afni's principal place of business is located in McLean County, Illinois.

## FACTUAL ALLEGATIONS

### *Overview of Afni*

16.     Afni began its business as a consumer collection agency in 1936 and now provides consumer collection and other customer engagement services.[1] The company has approximately 10,000 employees and has locations in Alabama, Arizona, Illinois, Kentucky, and the Philippines.[2]

17.     In the regular course of its business, Afni collects and maintains the PII of its clients, its clients' customers, its employees, and its former employees. Such PII includes but is not limited to basic personal information such as name, address, date of birth and Social Security number.

18.     Afni's website contains a Privacy Policy which states, "Afni, Inc. is committed to protecting any personal information that you may provide to us."[3]

19.     Afni recognizes that "[r]isk management and information security are more critical than ever[,]"[4] promising to remain "committed to providing the highest level of safety and security [for] our clients and employees."[5]

20.     Plaintiffs and Class members are, or were, customers of Afni's clients or employees of Afni and entrusted Afni with their PII either directly or through Afni's clients.

21.     Plaintiffs and Class members relied on the sophistication of Defendant's business to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class members

---

[1] *About Afni*, AFNI, INC., https://afni.com/about (last accessed Oct. 26, 2022).
[2] *Id.*
[3] *Privacy Policy*, AFNI, INC., https://afni.com/privacy-policy (last accessed Oct. 26, 2022).
[4] *Introducing our new CISO*, AFNI, INC., https://afni.com/news/2022/introducing-our-new-ciso (last accessed Oct. 26, 2022).
[5] *Safe & Secure*, AFNI, INC., https://afni.com/media/img/Afni-Case-Study-WAH-Security.pdf (last accessed Oct. 26, 2022).

demand security to safeguard their PII.

### *The Data Breach and Afni's Response*

22.     On or before June 7, 2021, an unauthorized individual, or unauthorized individuals, gained access to Afni's network systems and accessed files on Afni's network systems. Afni's letter to consumers does not specify exactly when the Data Breach began, only that it began "on or before June 7, 2021."[6]

23.     Afni did not begin to notify government agencies or the public about the Data Breach until over a year after the discovery of the breach, in or about July of 2022. Thus, Plaintiffs' and Class members' PII was in the hands of cybercriminals for over a year before they were warned that the Data Breach may have affected this information.

24.     The notice that Afni sent to those affected by the breach states the information that was disclosed included persons' "name, address, social security number, and date of birth."[7] The letter continues to state, "The confidentiality, privacy, and security of information in our care are among our highest priority."[8]

25.     Despite acknowledging that Plaintiffs' and Class members' PII was accessed by cybercriminals, Afni did not offer victims of the breach any remedy, such as credit monitoring or identity theft insurance. Instead, it simply counseled the victims "to remain vigilant against incidents of identity theft and fraud by reviewing your account statement and credit reports for suspicious activity" and advised them to "report and suspicious activity promptly to your bank or

---

[6] *Afni Data Breach Notice to Consumers*, OFFICE OF THE VERMONT ATTORNEY GENERAL, https://ago.vermont.gov/blog/2022/07/11/afni-data-breach-notice-to-consumers/?utm_source=rss&utm_medium=rss&utm_campaign=afni-data-breach-notice-to-consumers (last accessed Oct. 26, 2022).
[7] *Id.*
[8] *Id.*

financial institution."[9]

26.    Shockingly, Afni's breach notice does not indicate that it is taking any steps to secure its systems and protect Plaintiffs' and Class members' PII from further unauthorized access.

### Afni Knew that Criminals Target PII

27.    At all relevant times, Afni knew, or should have known, that the PII that it collected was a target for malicious actors. Despite such knowledge, Afni failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class members' PII from cyber-attacks that Afni should have anticipated and guarded against.

28.    It is well known among companies that store sensitive personally identifying information that sensitive information—such as the Social Security numbers ("SSNs") stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[10]

29.    In light of recent high profile data breaches, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Afni knew or should have known that its electronic records would be targeted by cybercriminals.

---

[9] *Id.*
[10] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER (Nov. 19, 2019, 8:05 A.M.), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

30.     Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

31.     Moreover, PII is a valuable property right.[11] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[12] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[13] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

32.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[14] Experian reports that a stolen credit or debit

---

[11] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[12] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[13] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[14] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed Oct. 28, 2022).

card number can sell for $5 to $110 on the dark web.[15] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[16]

33.     As a result of their real and significant value, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII, and other sensitive information directly on various Internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated and become more valuable to thieves and more damaging to victims.

34.     The information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.  The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers and names.

35.     Consumers place a high value on the privacy of that data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[17]

---

[15] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed Oct. 28, 2022).

[16] *In the Dark*, VPNOVERVIEW, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed Oct. 28, 2022).

[17] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

36.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### Theft of PII Has Grave and Lasting Consequences for Victims

37.     Theft of PII is serious. The FTC warns consumers that identity thieves use PII to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[18]

38.     Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[19] According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; use the victim's information in the event of arrest or court action.[20]

---

[18] *See* Federal Trade Commission, *What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Oct. 26, 2022).

[19] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id.*

[20] *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/ (last accessed Oct. 26, 2022).

39.     With access to an individual's PII, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the victim's name and SSN to obtain government benefits; or, filing a fraudulent tax return using the victim's information. In addition, identity thieves may receive medical services in the victim's name and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[21]

40.     Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[22]

41.     Theft of SSNs also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of her SSN, and a new SSN will not be provided until after the harm has already been suffered by the victim.

42.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[23]

---

[21] *See* Federal Trade Commission, *Warning Signs of Identity Theft*, IDENTITYTHEFT.GOV https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed Oct. 26, 2022).

[22] Identity Theft Resource Center, *2021 Consumer Aftermath Report*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/ (last accessed Oct. 26, 2022).

[23] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last accessed Oct. 26, 2022).

43. Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (*e.g.*, name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you don't have a credit freeze yet, you're easy pickings."[24]

44. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[25]

45. It is within this context that Plaintiffs and Class members must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

### Damages Sustained by Plaintiffs and the Other Class Members

46. Plaintiffs and Class members have suffered injury and damages, including, but not limited to: (i) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the

---

[24] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (August 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[25] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

increased risks of identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

47.     Plaintiffs and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

### *Plaintiff Caldwell Powell's Experience*

48.     In or about July of 2022, Plaintiff Caldwell Powell received a breach notification letter from Afni informing her that her personal information, including name, address, and Social Security Number had been exposed to cybercriminals during the Data Breach.

49.     Defendant obtained and continues to maintain Plaintiff Caldwell Powell's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure. Afni has an obligation to use reasonable measures to protect the PII it collects and stores in accordance with Afni's internal policies, as well as state and federal law.

50.     Thus, as a result of the Data Breach, Plaintiff Caldwell Powell has suffered a loss of time and has spent, and continues to spend, time on issues related to this Data Breach, such as time researching the facts and scope of the Data Breach and reaching out to counsel regarding the Data Breach. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Defendant's direction by way of the Data Breach notice where Defendant advised Plaintiff Caldwell Powell to mitigate her damages by, among other things, monitoring accounts for fraudulent activity.

51.     Plaintiff Caldwell Powell suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that was compromised in and as a result of the Data Breach.

52.     Plaintiff Caldwell Powell has suffered and continues to suffer annoyance, interference, and inconvenience as a result of the Data Breach.

53.     Plaintiff Caldwell Powell's privacy has been invaded by the access to and exfiltration of her PII, which is now in the hands of third-parties not authorized to view or possess her PII. Plaintiff Caldwell Powell has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially her Social Security number, being placed in the hands of criminals. Plaintiff Caldwell Powell remains at a present risk and will continue to be at increased risk of identity theft and fraud for years to come, if not the rest of her life. As a result, Plaintiff Caldwell Powell has and will spend considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

### Plaintiff Campbell's Experience

54.     Plaintiff Campbell is a former Afni employee, having worked for the company from approximately 1997 until 2020.

55.     As a condition of his employment, Afni required Plaintiff Campbell to provide it with his PII. Plaintiff Campbell provided his PII to Afni and trusted the company would use reasonable measures to protect it according to Afni's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Campbell's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

56.     Plaintiff Campbell typically takes measures to protect his PII and is very careful about sharing his PII. Plaintiff Campbell has never knowingly transmitted unencrypted PII over the internet or other unsecured source. Plaintiff Campbell stores any documents containing his PII in a safe and secure location, and he diligently chooses unique usernames and passwords for his

online accounts.

57.     In a letter he received on approximately September 15, 2022, Defendant notified Plaintiff Campbell that Defendant's network had been accessed and that the following information may have been impacted: his name, address, Social Security number, and date of birth. Plaintiff Campbell has not received any other notices of a data breach since receiving this letter.

58.     In July 2021, shortly after the Data Breach occurred, Plaintiff Campbell had $1,495 in unemployment benefits stolen. He attempted to use his unemployment card and there were no funds available. Plaintiff Campbell then inquired with the unemployment department and was told that someone in South Carolina had stolen the funds. After approximately four months, Plaintiff Campbell was reimbursed for the $1,495.00 that was stolen from him.

59.     Plaintiff Campbell spent a significant amount of time dealing with this theft, including making calls to the fraud department of the unemployment office and driving to an unemployment office in Peoria, Illinois to verify his identity.

60.     Thus, as a result of the Data Breach, Plaintiff Campbell has suffered a loss of time and has spent, and continues to spend, a considerable amount of time on issues related to this Data Breach, such as significant time spent dealing with fraud and monitoring his accounts. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Defendant's direction by way of the Data Breach notice where Defendant advised Plaintiff Campbell to mitigate his damages by, among other things, monitoring accounts for fraudulent activity.

61.     Plaintiff Campbell suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that he entrusted to Defendant for the purpose of obtaining and/or maintaining employment with Defendant, which was compromised in and as a result of the Data Breach.

62.     Plaintiff Campbell's privacy has been invaded by the access to and exfiltration of his PII, which is now in the hands of third-parties not authorized to view or possess his PII.

63.     Plaintiff Campbell has suffered and continues to suffer annoyance, interference, and inconvenience as a result of the Data Breach, as well as anxiety and stress caused by the loss of privacy, fraud that he suffered, and risk of future harm.

64.     Plaintiff Campbell has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, being placed in the hands of criminals. Plaintiff Campbell remains at a present risk and will continue to be at increased risk of identity theft and fraud for years to come, if not the rest of his life. As a result, Plaintiff Campbell has and will spend considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

*Plaintiff Green's Experience*

65.     On or around July 29, 2022, Plaintiff Green received a breach notification letter from Afni informing her that her personal information, including name, address, and Social Security Number had been exposed to cybercriminals during the Data Breach.

66.     Plaintiff Green has not received any other notices of a data breach and, to her knowledge, has never before been the victim of a data breach.

67.     Defendant obtained, and upon information and belief, continues to maintain Plaintiff Green's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.  Afni has an obligation to use reasonable measures to protect the PII it collects and stores in accordance with Afni's internal policies, as well as state and federal law.

68.     Plaintiff Green typically takes measures to protect her PII and is very careful about

sharing her PII. Plaintiff Green has never knowingly transmitted unencrypted PII over the internet or other unsecured source. Plaintiff Green stores any documents containing her PII in a safe and secure location.

69.     Thus, as a result of the Data Breach, Plaintiff Green has suffered a loss of time and has spent, and continues to spend, a considerable amount of time on issues related to this Data Breach, such as time researching the facts and scope of the Data Breach, monitoring her accounts and personal information, and taking other steps in an attempt to mitigate the adverse consequences of the Data Breach. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Defendant's direction by way of the Data Breach notice where Defendant advised Plaintiff Green to mitigate her damages by, among other things, monitoring accounts for fraudulent activity.

70.     Plaintiff Green suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that was compromised in and as a result of the Data Breach.

71.     Plaintiff Green's privacy has been invaded by the access to and exfiltration of her PII, which is now in the hands of third-parties not authorized to view or possess her PII.

72.     Plaintiff Green has suffered and continues to suffer annoyance, interference, and inconvenience as a result of the Data Breach, as well as anxiety and stress caused by the loss of privacy and risk of future harm.

73.     Plaintiff Green has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially her Social Security number, being placed in the hands of criminals. Plaintiff Green remains at a present risk and will continue to be at increased risk of identity theft and fraud for years to come,

if not the rest of her life. As a result, Plaintiff Green has and will spend considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

### *Plaintiff Davis's Experience*

74.     On or around August 15, 2022, Plaintiff Thomas Davis received a breach notification letter from Afni informing her that her personal information, including name, address, and Social Security Number had been exposed to cybercriminals during the Data Breach.

75.     Prior to the Data Breach, Plaintiff Davis was an employee for Afni, Inc., from 2019 through 2020 as a Care Associate. He noticed Afni's promises of keeping his "data safe" and reasonably believed that Afni maintained a secure network.

76.     In the course of his employment, Plaintiff Davis was required to supply Afni with his PII, including but not limited to his name, address, phone number, date of birth, driver's license, Social Security number, and other financial information. At the time that he provided this private information, he was assured and likewise assumed it would be protected by Afni, regardless of whether he ultimately stayed an employee.

77.     Plaintiff Davis has not received any other notices of a data breach and, to his knowledge, has never before been the victim of a data breach.

78.     Defendant obtained, and upon information and belief, continues to maintain Plaintiff Davis's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.  Afni has an obligation to use reasonable measures to protect the PII it collects and stores in accordance with Afni's internal policies, as well as state and federal law.

79.     Plaintiff Davis typically takes measures to protect his PII and is very careful about sharing his PII. Plaintiff Davis has never knowingly transmitted unencrypted PII over the internet

or other unsecured source. Plaintiff Davis stores any documents containing his PII in a safe and secure location.

80.     On or about July 22, 2022, Plaintiff Davis experienced identity theft. Someone used his Spectrum Mobile account and ported it to a T-Mobile device. From there they were able to pretend to be Mr. Davis, using his phone to approve a two-factor authentication request and access his financial account information. Plaintiff Davis's Bank, US Bank, alerted him of the fraudulent activity and his data misuse.

81.     In mid-summer 2022, Plaintiff Davis noticed he was receiving a significant number of spam texts and phone calls, sometimes multiple in a day. Prior to that time, he rarely received spam calls and texts. Plaintiff Davis is concerned that the spam calls and texts are being placed with the intent of obtaining more personal information from him and committing identity theft by way of a social engineering attack.

82.     In addition, Plaintiff Davis was notified through his credit monitoring services that his email address and social security number was found on the dark web. Plaintiff Davis reasonably believes that his Private Information may have already been sold by the cybercriminals. Had he been notified of Afni's breach in a timely manner, he could have mitigated some of his injuries.

83.     Plaintiff has also notified his state Attorney General, contacted an attorney, froze all his credit reports, and checks his accounts more frequently in an effort to mitigate the damage that has been caused by Afni.

84.     Thus, as a result of the Data Breach, Plaintiff Davis has suffered a loss of time and has spent, and continues to spend, a considerable amount of time on issues related to this Data Breach, such as time researching the facts and scope of the Data Breach, monitoring his accounts and personal information, and taking other steps in an attempt to mitigate the adverse consequences

of the Data Breach. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Defendant's direction by way of the Data Breach notice where Defendant advised Plaintiff Davis to mitigate his damages by, among other things, monitoring accounts for fraudulent activity.

85.     Plaintiff Davis suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that was compromised in and as a result of the Data Breach.

86.     Plaintiff Davis's privacy has been invaded by the access to and exfiltration of his PII, which is now in the hands of third-parties not authorized to view or possess his PII.

87.     Plaintiff Davis has suffered and continues to suffer annoyance, interference, and inconvenience as a result of the Data Breach, as well as anxiety and stress caused by the loss of privacy, fraud that he suffered, and risk of future harm.

88.     Plaintiff Davis has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, being placed in the hands of criminals. Plaintiff Davis remains at a present risk and will continue to be at increased risk of identity theft and fraud for years to come, if not the rest of his life. As a result, Plaintiff Davis has and will spend considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

## CLASS ACTION ALLEGATIONS

89.     This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

90.     Plaintiffs bring this action on behalf of themselves and all members of the following class of similarly situated persons:

> All persons whose PII was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach (the "Class").

91.     Excluded from the Class is Afni, Inc. and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

92.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

93.     The members of the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. Afni reported to the Maine Attorney General that approximately 261,449 persons' information was exposed in the Data Breach.[26]

94.     Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

> a.  Whether Afni had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class members' PII from unauthorized access and disclosure;
>
> b.  Whether Afni failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class members' PII;
>
> c.  Whether an implied contract existed between Class members and Afni, providing that Afni would implement and maintain reasonable security

---

[26] *Data Breach Notifications*, Office of the Maine Attorney General, https://apps.web.maine.gov/online/aeviewer/ME/40/22f470bc-511d-4067-911d-bbf0b230e9c6.shtml (last accessed Oct. 26, 2022).

measures to protect and secure Class members' PII from unauthorized access and disclosure;

d.  Whether Afni breached its duties to protect Plaintiffs' and Class members' PII; and

e.  Whether Plaintiffs and Class members are entitled to damages and the measure of such damages and relief.

95.  Afni engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

96.  Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had their PII compromised in the Data Breach. Plaintiffs and Class members were injured by the same wrongful acts, practices, and omissions committed by Afni, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

97.  Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are adequate representatives of the Class in that they have no interests adverse to, or that conflict with, the Class they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

98.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs

and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Afni, so it would be impracticable for Class members to individually seek redress from Afni's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

99.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

100.   Afni owed a duty to Plaintiffs and Class members to exercise reasonable care in safeguarding and protecting their PII in its possession, custody, or control.

101.   Afni's duties arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by business, such as Afni, of failing to employ reasonable measures to protect and secure PII.

102.   Afni violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiffs' and Class members' PII and not complying with applicable industry standards. Afni's conduct was particularly unreasonable given the nature and amount of PII it obtains and stores, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damages that would result to Plaintiffs and the other Class members.

103.    Plaintiffs and Class members are within the class of persons that Section 5 of the FTCA was intended to protect.

104.    The harm occurring as a result of the Data Breach is the type of harm Section 5 of the FTCA weas intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiffs and Class members as a result of the Data Brach.

105.    Afni knew the risks of collecting and storing Plaintiffs' and Class members' PII and the importance of maintaining secure systems. Afni knew of the many data breaches that targeted companies that stored PII, including itself, in recent years.

106.    Given the nature of Afni's business, the sensitivity and value of the PII it maintains, and the resources at its disposal, Afni should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

107.    Afni breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it—including Plaintiffs' and Class members' PII.

108.    It was reasonably foreseeable to Afni that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would

result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class members' PII to unauthorized individuals.

109.    But for Afni's negligent conduct or breach of the above-described duties owed to Plaintiffs and Class members, their PII would not have been compromised.

110.    It was reasonably foreseeable to Afni that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiffs' and Class members' PII to unauthorized individuals.

111.    The injury and harm that Plaintiffs and Class members suffered was the direct and proximate result of Afni's negligence. Plaintiffs and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

## COUNT II
## BREACH OF IMPLIED CONTRACT

112.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

113.    In connection with the dealings Plaintiffs and Class members had with Afni, Plaintiffs and Class members entered into implied contracts with Afni.

114.    Pursuant to these implied contracts, Plaintiffs and Class members provided Afni with their PII, directly or indirectly, in order for Afni to provide services. In exchange, Afni agreed to, among other things, and Plaintiffs and Class members understood that Afni would: (1) provide services to Plaintiffs and Class member; (2) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class members' PII; and (3) protect Plaintiffs' and Class members PII in compliance with federal and state laws and regulations and industry standards.

115.    The protection of PII was a material term of the implied contracts between Plaintiffs and Class members, on the one hand, and Afni, on the other hand. Indeed, Afni was clear in its Privacy Policy, and Plaintiffs understood, that Afni supposedly respects and is committed to protecting customer and employee privacy.

116.    Had Plaintiffs and Class members known that Afni would not adequately protect its clients' customers', former customers', employees', and former employees' PII, they would not have provided Afni or Afni's clients with their PII.

117.    Plaintiffs and Class members performed their obligations under the implied contracts when they provided Afni with their PII, either directly or indirectly.

118.    Afni breached its obligations under their implied contracts with Plaintiffs and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII and in failing to implement and maintain security protocols and procedures to protect Plaintiffs' and Class members' PII in a manner that complies with applicable laws, regulations, and industry standards.

119.    Afni's breach of its obligations of its implied contracts with Plaintiffs and Class members directly resulted in the Data Breach and the injuries that Plaintiffs and all other Class members have suffered from the Data Breach.

120.    Plaintiffs and all other Class members were damaged by Afni's breach of implied contracts because: (i) they paid—directly or indirectly—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft—risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII has been breached; (v) they were deprived of the value of their PII, for which there is a well-established national and international market; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft they face and will continue to face.

## COUNT III
### VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT ("ICFA")
### 815 ILCS 505/2, *et seq.*

121.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

122.    Plaintiffs and the Class are "consumers" as defined in 815 Ill. Comp. Stat. § 505/1(e).  Plaintiffs, the Class, and Afni are "persons" as defined in 815 Ill. Comp. Stat. § 505/1(c).

123.    Afni engaged in "trade" or "commerce," including the provision of services, as defined under 815 Ill. Comp. Stat. § 505/1(f). Afni engages in the sale of "merchandise" (including services) as defined by 815 Ill. Comp. Stat. § 505/1(b) and (d).

124.    Afni offered and continues to offer customer engagement services in the State of Illinois.

125.    Afni obtained Plaintiffs' and Class members' PII in connection with Afni's customer engagement services and employment.

126.    Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment and omission of material facts in connection with the sale and advertisement of their services in violation of the ICFA, including: (i) failing to maintain adequate data security to keep Plaintiffs' and the Class members' sensitive PII from being stolen by cybercriminals and failing to comply with applicable state and federal laws and industry standards pertaining to data security, including the FTC Act; (ii) failing to disclose or omitting materials facts to Plaintiffs and the Class regarding their lack of adequate data security and inability or unwillingness to properly secure and protect the PII of Plaintiffs and the Class; (iii) failing to disclose or omitting materials facts to Plaintiffs and the Class about Defendant's failure to comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the PII of Plaintiffs and the Class; and (iv) failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Plaintiffs' and the Class's PII and other personal information from further unauthorized disclosure, release, data breaches, and theft.

127.    Afni makes explicit statements to its customers and employees that their PII will remain private, as evidenced by its Privacy Policy.

128.    These actions also constitute deceptive and unfair acts or practices because Defendant knew the facts about their inadequate data security and failure to comply with applicable state and federal laws and industry standards would be unknown to and not easily discoverable by Plaintiffs and the Class and defeat their reasonable expectations about the security of their PII.

129.    Defendant intended that Plaintiffs and the Class rely on its deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Defendant's offering of goods and services.

130.    Defendant's wrongful practices were and are injurious to the public because those practices were part of Defendant's generalized course of conduct that applied to the Class. Plaintiffs and the Class have been adversely affected by Defendant's conduct and the public was and is at risk as a result thereof.

131.    Afni further violated the ICFA by failing to notify its clients, its clients' customers, its employees, and its former employees of the data breach in a timely manner. The Illinois Personal Information Protection Act requires entities that experience a data breach to notify Illinois residents "in the most expedient time possible and without unreasonable delay." 815 ILCS 530/10. Violation of the Illinois Personal Information Protection Act constitutes an unlawful practice under the ICFA. 815 ILCS 530/20.

132.    Due to the Data Breach, Plaintiffs and Class members have lost property in the form of their PII. Further, Afni's failure to adopt reasonable practices in protecting and safeguarding its customers' and employees' PII will force Plaintiffs and Class members to spend time or money to protect against identity theft. Plaintiffs and Class members are now at a higher risk of identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for Afni's practice of collecting and storing PII without appropriate and reasonable safeguards to protect such information.

133.    As a result of Afni's violations of the ICFA, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they

are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

134.     Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiffs and the Class seek actual and compensatory damages, injunctive relief, and court costs and attorneys' fees as a result of Defendant's violations of the ICFA.

## COUNT IV
## UNJUST ENRICHMENT

135.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

136.     This claim is pleaded in the alternative to the breach of implied contract claim.

137.     Plaintiffs and Class members conferred a monetary benefit on Defendant, by providing Afni with their valuable PII.

138.     Afni enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class members' PII.

139.     Moreover, Afni retained the PII with no legitimate employment or business purpose.

140.     Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Afni instead calculated to avoid its data security obligations at the expense of Plaintiffs and Class members by utilizing cheaper, ineffective security measures. Plaintiffs and Class members, on the other hand, suffered as a direct and proximate result of Afni's failure to provide the requisite security.

141.    Under the principles of equity and good conscience, Afni should not be permitted to retain the monetary value of the benefit belonging to Plaintiffs and Class members, because Afni failed to implement appropriate data management and security measures that are mandated by industry standards.

142.    Afni acquired the monetary benefit and PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

143.    If Plaintiffs and Class members knew that Afni had not secured their PII, they would not have agreed to provide their PII to Afni or would have requested that the PII be deleted upon termination of the employment or business relationship.

144.    Plaintiffs and Class members have no adequate remedy at law.

145.    As a direct and proximate result of Afni's conduct, Plaintiffs and Class members have suffered and will continue to suffer other forms of injury and harm.

**COUNT V**
**INVASION OF PRIVACY**

146.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

147.    Plaintiffs and Class members had a legitimate expectation of privacy regarding their PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

148.    Afni owed a duty to Plaintiffs and Class member to keep their PII confidential.

149.    Afni affirmatively and recklessly disclosed Plaintiffs' and Class Members' PII to unauthorized third-parties after failing to recognize and then responding to a foreseeable phishing attack.

150.    The unauthorized disclosure and/or acquisition (i.e., theft) by a third party of Plaintiffs' and Class members' PII is highly offensive to a reasonable person.

151.    Afni's reckless and negligent failure to protect Plaintiffs' and Class members' PII constitutes an intentional interference with Plaintiffs' and the Class members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

152.    Afni's failure to protect Plaintiffs' and Class members' PII acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

153.    Afni knowingly did not notify Plaintiffs and Class members in a timely fashion about the Data Breach.

154.    Because Afni failed to properly safeguard Plaintiffs' and Class Members' PII, Afni had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

155.    As a proximate result of Afni's acts and omissions, Plaintiffs' and the Class members' private and sensitive PII was accessed and stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

156.    Afni's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII are still maintained by Afni with their inadequate cybersecurity system and policies.

157.    Plaintiffs and Class members have no adequate remedy at law for the injuries relating to Afni's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Afni's inability to safeguard Plaintiffs' and the Class's PII.

158.    Plaintiffs, on behalf of themselves and Class members, seek injunctive relief to enjoin Afni from further intruding into the privacy and confidentiality of Plaintiffs' and Class members' PII.

159.    Plaintiffs, on behalf of themselves and Class members, seek compensatory damages for Afni's invasion of privacy, which includes the value of the privacy interest invaded by Afni, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

## **PRAYER FOR RELIEF**

Plaintiffs, individually, and on behalf of all other members of the Class, respectfully request that the Court enter judgment in their favor and against Afni as follows:

A.    Certifying the Class as requested herein, designating Plaintiffs as Class representatives, and appointing Ben Barnow of Barnow and Associates, P.C. and Gary M. Klinger of Milberg Coleman Bryson Phillips Grossman, PLLC as Co-Lead Class Counsel;

B.    Awarding Plaintiffs and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.    Awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and the Class, seek appropriate injunctive relief designed to prevent Afni from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

D.      Awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Awarding Plaintiffs and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.


Dated: October 28, 2022                         Respectfully submitted,

/s/ Ben Barnow
Ben Barnow
Anthony L. Parkhill
Riley W. Prince
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Ste. 1630
Chicago, IL 60606
Tel: 312.621.2000
Fax: 312.641.5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com
rprince@barnowlaw.com

Gary M. Klinger
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
gklinger@milberg.com

*Interim Co-Lead Counsel*

Gary E. Mason*
Danielle L. Perry*
Lisa A. White*
**MASON LLP**
5301 Wisconsin Avenue, NW, Suite 305
Washington, DC 20016
Tel: (202) 429-2290
gmason@masonllp.com
dperry@masonllp.com
lwhite@masonllp.com

William B. Federman*
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
wbf@federmanlaw.com

A. Brooke Murphy*
**MURPHY LAW FIRM**
4116 Will Rogers Pkwy, Suite 700
Oklahoma City, OK 73108
Telephone: (405) 389-4989
abm@murphylegalfirm.com

Mary C. Turke
Samuel J. Strauss
Raina C. Borrelli*
**TURKE & STRAUSS LLP**
613 Williamson St., Suite 201
Madison, WI 53703
Telephone: (608) 237-1775
Facsimile: (608) 509-4423
mary@turkestrauss.com
sam@turkestrauss.com
raina@turkestrauss.com

Attorneys for Plaintiffs
*admission to be sought